UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                        CASE NO.: 6:24-cr-00250-JA-LHP

NHAN PHAM,

    Defendant.

_____/

## SENTENCING MEMORANDUM

Dr. Nhan Pham requests this Court impose a probationary sentence pursuant to Supreme Court precedent and the factors set forth under 18 U.S.C. § 3553(a).

## STATEMENT OF FACTS

On May 7, 2025, Pham pled guilty to receipt in interstate commerce and proffered delivery of an adulterated device in violation of 21 U.S.C. § 333(a)(2). Doc. 42. Pham's sentencing hearing is set for December 19, 2025. Doc. 49. 3.

## MEMORANDUM OF LAW

*Introduction*

In the dismal haze of federal sentencing, how can justice be achieved in a case like Pham's? It certainly cannot be achieved through the sentencing guidelines – an irrational and misguided matrix that equates justice with uniformity regardless of the unique circumstances of each individual case. Indeed, what Pham

endured in the past and what he will surely lose in the future can never be captured by a sentencing matrix bathed in retribution. It is a matrix which reduces the totality of a man's existence, as well as his fate, to mere numbers. And it is a matrix that determines punishment solely based on a Defendant's worst moment, regardless of the other redeeming aspects of his life.

In *Koon*, the United States Supreme Court (in its better days) asserted that every federal sentencing should account for the unique factors that sometimes mitigate and sometimes magnify the crime and punishment to ensue. *See Koon v. United States*, 518 U.S. 81 (1996).

This assertion has often been considered as a call for individualized sentencing. While true, such a characterization obscures the larger implications of what individualized sentencing demands. Individualized sentencing requires more than tracing one's figure along a horizontal and vertical axis to arrive at some number of months.

Rather, the larger implication of an individualized assessment is found in the court's obligation to evaluate and consider each defendant's unique and complete story.  Such a comprehensive approach necessarily rejects the narrative of the guidelines – an inchoate tale that depicts a defendant's story as nothing more and nothing less than his criminal act.

For Pham, then, much depends on whether truth can be found in the fray of competing stories told at his sentencing. The notion that the vagaries of the

2

narrative will impact the fairness of his sentence is not remarkable. Indeed, stories lie at the heart of human evolution and identity. *See*, *e.g.*, Parul Sehgal, *The Tyranny of the Tale*, The New Yorker (July 3, 2023).[1]

Like any other humane event, federal sentencing is controlled by the whims of narrative. Like so many defendants, Mr. Pham is burdened by the simplistic narrative that follows him into this Courtroom – a story told by an Indictment and PSR. The Indictment casts the Defendant as a villain deserving of retribution. The PSR follows with a short story distorted by its emphasis on the defendant's criminal conduct. While it is not surprising that Pham's fate is subject to narrative, it is remarkable that his punishment is shaped by a limited and unforgiving tale told by an Indictment and PSR.[2] That Pham's fate could be bartered and lost in such a way may be lamentable, but it is not extraordinary. It's how the federal sentencing process often plays out.

---

[1] Parul Sehgal states:

> we recall facts longer if they are embedded in narrative; stories boost production of cortisol (encouraging attentiveness) and oxytocin (encouraging connection). We are pattern-seeking, meaning-making creatures, who project our narrative needs upon the world. *Homo sapiens* is a storytelling animal that thinks in stories . . .

Sehgal, *The Tyranny of the Tale*. As storytelling beings, we comprehend the world through narrative. And we give meaning to our own existence and the lives of others through the narrative we construct – stories that inspire, stories that define, and stories that often mislead.

[2] Truly, then, the Indictment and PSR often tell a tale of sound and fury, signifying nothing. See William Shakespeare, *Macbeth*, Act 5, Scene 5, 19-28 (1603)("Life's but a walking shadow, a poor player, that struts and frets his hour upon the stage, and then is heard no more. It is a tale . . . full of sound and fury, signifying nothing").

For Pham, then, justice ultimately depends on this Court's choice -- will it choose a limited tale of criminal conduct and history, or will this Court consider an existence that lies beyond the Indictment and PSR. Choosing the Indictment's and PSR's narrow path of past wrongs is antagonistic to justice. It is a path that depends on an restricted narrative in which the sins of a defendant's past outweigh the virtues of his future.[3]  Admittedly, the promise of such a calculation is alluring since it removes the angst of making individual assessments concerning a defendant.[4] While this calculation is seductive in its simplicity, it is alarming in its effect. To be sure, simple narratives are often false ones ("Stop the Steal;" "The War on Drugs;" "Crack Babies;" and "Equal Protection under the Law").

The Supreme Court and statutory precedent demand more. These authorities contemplate that the sentencing process requires a consideration that goes beyond limited narratives. "There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her "as an individual."" *Concepcion v. United States,* 597 U.S. 481, 486 (2022)(citation omitted). Thus, a district court judge has "wide

---

[3] *But see* Oscar Wilde, *A Woman of No Importance* (1893)("[E]very saint has a past, and every sinner has a future").

[4] A sole reliance on Pham's offense conduct reflects a human aversion to the uncertainty and ambiguity attached to predicting a man's unknowable future. *See, e.g,* Maria Konnikova, *Why We Need Answers*, The New Yorker (Apr. 30, 2013). As Konnika asserts, studies demonstrate that the need to respond to uncertainty or a lack of clarity is present in the early stages of human development. *Id.*  Because of our distress with the unknown and uncertain, we seek to achieve "cognitive closure" defined as the "desire for a firm answer to a question and an aversion to ambiguity." *Id.* (citation omitted).

discretion in the sources and types of evidence used" to craft appropriate sentences. *Id.* (citation omitted). *See also Pepper v. United States*, 562 U.S. 476, 488 (2011)("Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant"). Consistent with this conception, 18 U.S.C. § 3553(a) requires a court to consider a broad range of information in determining a defendant's sentence. *See also* 18 U.S.C. § 3577 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence").

These authorities understand that biased and limited narratives negatively impact the decision-making process. *See*, *e.g.*, Akira Kurosawa, *Rashomon* (Daiei Films 1951). Thus, justice lies not in the limited tales the parties tell, but rather in the expansive narratives a court needs to hear. It is only through the latter mechanism that this Court achieves an accurate perspective in measuring a Defendant's life.

The following sections analyze the section § 3553 factors against the factual backdrop of Pham's case since each of these sentencing factors support his request for a variance.

## Chapter 1
## Nature of the Offense and the History of the Defendant

*But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.*

*United States v. Adelson, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006)(Rakoff, J.).*

In linking a defendant's criminal conduct with his personal history and characteristics, the first section 3553(a) factor comprehends that a defendant's criminal conduct cannot be considered in isolation as the guidelines demand. Nor should it be accepted as the paramount sentencing factor. *See*, *e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (Rakoff, J.). In this way, the first factor recognizes that every case contains a narrative of "human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon,* 552 U.S. at 81.

Pham recognizes the seriousness of his offense. But deconstructing the narrative of his life is where the interplay between a client's characteristics and criminal conduct becomes critical. To be sure, the blueprint for Pham's criminal conduct was drafted in his formative years. Pham's narrative is a story of great suffering and struggle but also of perseverance and triumph. Moreover, his childhood experience of unwavering poverty and trauma provides insight into the factors that led him to commit his criminal act.

At 11 years old, Pham and his older sister fled Viet Nam on a small fishing boat with 360 other refugees. Before his escape, this 11-year-old boy promised his

6

mother that he would become a doctor in America and would return to care for her and his diabetic grandmother. After eight days, Pham and the other refugees were attacked by Thai pirates who stole his possessions. The refugee boat managed to make it to a nearby drilling platform, where the refugees huddled on the steel structure that remained until another boat finally transported them to Pulau Bidong,[5] a refugee camp on a small Malaysian island.

Concerning his time in the refugee camp, Mr. Pham asserts:

> The living conditions were horrendous. My sister and I resided in makeshift tents and huts, often sharing cramped spaces with multiple families. There was no running water or electricity. We had to fetch water from wells and gather firewood from the forests to cook our meals. I remember the terror of waking up one night to discover that rats had gnawed at my foot. The bite marks were alarming, but I immediately soaked my wounds in ocean to prevent infection. Life in the camp was a constant struggle for survival.

After enduring these harsh conditions, the young Pham and his sister were moved again to a second refugee camp at Bataan in the Philippines. In the refugee camps, the Phams learned rudimentary English with the hope that they could somehow make it to the United States. In the summer of 1981, a Lutheran Church in Maryland sponsored the Phams and reunited them with their two brothers, who had also fled Viet Nam, in the United States.

In the United States, Pham learned English by watching cartoons including

---

[5] Because Pulau Bidong was a small island, it only had the capacity to accommodate 4,500 refugees. See *Pulau Bidong Refugee Camp 1978-1991*, Refugee Camp Info; https://refugeecamps.net/BidongStory.html (last visited October 15, 2025). Nevertheless, it housed up to 40,000 refugees from Viet Nam and Cambodia during peak seasons. *Id.*

*Casper the Friendly Ghost* and *Woody Woodpecker*. In the United States, poverty was Pham's constant companion. He states:

> All my clothes were hand-me-downs from Goodwill, and my sister would often bring me garments that were two or three sizes too large. I recall attending 6th and 7th grade, often being a target for ridicule from other children because of my ill-fitting clothes and worn-out shoes. While I tried to appear indifferent, their laughter and judgment deeply affected me. It was then that I made a solemn promise to myself: I would dedicate myself to my studies, work relentlessly, and achieve financial success. My motivation was clear – to earn respect, to never again be laughed at, and to afford clothes that fit properly and were not old and dirty.

Reflecting on his tumultuous and impoverished flight from Viet Nam to the United States, Pham states that "my journey, marked by loss, fear, resilience, and an unwavering determination, has shaped who I am today."

Because of his limitations with the English language, Pham gravitated to the universal language of science and math. He succeeded in school in these areas eventually attending college and medical school. For the next 11 years, from 1992 through 2003, Dr. Pham pursued his medical training culminating in a two-year plastic surgery residency in Philadelphia, Pennsylvania.

Significantly, during his medical training, he enlisted in the U.S. Army Reserves to serve his new homeland. During his military career, Pham received commendations for his voluntary activities and an award for Outstanding Service. *See* PSR at 74. He was honorably discharged in 2007 after six years of service. *Id*. Pham's exemplary military service supports his request for a variance. See *Porter*

8

*v. McCollum*, 558 U.S. 30, 43 (2009)("Our Nation has a long tradition of according leniency to veterans in recognition of their service . . ."). Indeed, even the sentencing guidelines recognize a defendant's military service as basis for a potential departure. *See* USSG §5H1.11.

Despite his criminal conduct, Pham's medical career in private practice was outstanding in his dedication to his patients regardless of their station in life. *See Letters of Support*, attached hereto as Exhibit 1. As Nurse Lysette Delgado writes:

> [Dr. Pham] was deeply committed to delivering high-quality care, particularly to underserved and medically vulnerable populations. It was not uncommon for him to waive surgical fees for patients experiencing financial hardship . . .As both a healthcare provider and a patient, I view his actions as a clear demonstration of clinical excellence, ethical responsibility, and human compassion.

*See* Ex. 1, *Letter of Lysette Delgado, R.N. See also id. Letter of Nanette Munoz*

> Dr. Pham stood out as a physician and leader who approached his work with compassion, humility, and a profound sense of integrity . . [he] willingly willingly provided care for patients diagnosed with HIV or hepatitis—patients that, unfortunately, many providers in the cosmetic field often hesitate to treat.

Ms. Munoz further notes that Pham showed great compassion when he paid her rent when she could not afford it. *Id.* Likewise, Leslie Jones states "I have always noticed that [Dr. Pham] cares about his patients and treats them like there (sic) his own family. He is a very caring person. He is the type of person that would give his own shirt off his back for a person in need." *See id*.; *Letter of Leslie Jones*.

After reiterating these sentiments, Brenda Diaz writes that Dr. Pham's

compassion and generosity extend to the greater community. *See id.*, *See also id.*, *Letter of Brenda Diaz* ("Dr. Pham is deeply involved in charitable endeavors, regularly giving back to the less fortunate and his community. His generosity and kindness know no bounds, and I have personally witnessed his unwavering support for those in need"). Khiet Ton states that Pham's "name is synonymous with compassion, excellence, and community service." *Id*, *Letter of Khiet Ton*. Mr. Ton further describes Pham as "kind, generous and humble" who "gives back constantly." *Id. See also id.*, *Letters of Fernando Orriols & Jacquelyn Grubbs* (same).

Just like his exemplary military career, Pham's great compassion and charitable works supports his request for a variance. *See, e.g., United States v. Tomko*, 562 F.3d 558, 569-71 (3d Cir. 2009) (en banc) (where defendant was convicted of tax evasion of $225,000 and faced a guidelines sentence of 12-18 months, district court's sentence to probation on condition of one year home detention was not unreasonable because of his "negligible criminal history, his employment record, his community ties, and his extensive charitable works"); *United States v. Thurston,* 544 F.3d 22, 26 (1st Cir. 2008) (where defendant was convicted of fraud in excess of five million dollars and guidelines capped at 60 months, district court's sentence of 3-months was affirmed based on defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *see also United States v. Cooper*, 394 F.3d 172 (3rd Cir.

10

2005) (similar).

Because Pham's life embodies some of the best aspects of our humanity, it seems unfathomable that he would engage in serious criminal conduct. To be sure, his actions are inconsistent with the life he has led and the man he has proven to be. To comprehend Pham's crime requires an understanding of the forces that led to his act. While Pham correctly observes that his experience as a refugee shaped him in profound ways, he does appreciate the journey's psychological impact on him. The impact of Pham's impoverished childhood directly impacted his later criminal conduct.  Studies prove that children raised in poverty display greater activity in the amygdala with lesser activity in the prefrontal cortex.  Pilyoung Kim et al. *Effects of Childhood Poverty and Chronic Stress on Emotion Regulatory Brain Function in Adulthood ("Effects of Childhood Poverty"),* Nat'l Academy of Sciences (2013), hereto attached as Exhibit 2. "The amygdala and prefrontal cortex (PFC) play a critical role for stress and emotion regulation." *Id*. Accordingly, "[c]hildhood poverty has been linked to emotion dysregulation which is further associated with negative physical and psychological health in adulthood." *Id*. Emotional dysregulation involves in a difficulty in regulating one's emotional response to a stressor. Zia Sherrell, *What is Emotional Dysregulation and How to Manage It?*, Medical News Today (Oct. 9, 2024). And it appears in individuals who suffer from depression and anxiety disorders including post-traumatic stress disorder. *See* Kim, *Effects of Childhood Poverty. See also* Deleene Menefeee et al,

*The Importance of Emotional Regulation in Mental Health*, Am. J. Lifestyle Med. (Jan. 12, 2022).

Against this backdrop, the argument is not that Pham should receive mercy because of his childhood poverty and trauma. Rather, the critical question is how his psychological state impacted his decision-making at the time he committed his crime. To answer that question requires a recognition of Pham's extremely stressful situation during his criminal conduct.

At the time he committed his offense, Dr. Pham was the surgeon and partner at a cosmetic surgery practice in Celebration, Florida. The medical practice was managed by his cousin Nghi A. Do and his wife Hanu Tran. Unfortunately, for a period of five years, Hanu Tran embezzled $500,000 which she sent back to Viet Nam. As the practice descended into financial difficulties, Pham gave up his own paycheck to pay vendors and employees.

During this period, Pham experienced substantial emotional and psychological strain. The unrelenting financial distress led to symptoms of depression and anxiety. He was haunted by the fear of not being able to meet his basic obligations. He worked full days at the clinic and then conducted cosmetic procedures three to four evenings each week. He had previously tested non-medical grade silicone injections on himself, then monitored himself for six months to assess their effects before offering them to clients. The cumulative effect of exhaustion and emotional strain including severe anxiety significantly impaired

his judgment. His lack of judgment occurred during the height of his financial despair and represents actions that were influenced under extreme stress rather than by malicious intent.

Recognizing the error of his ways, Pham attempted to correct the damage to his patients. Moreover, he has already contributed $50,000 to their restitution and is committed to paying the rest while on release.

While Pham's impoverished background and professional circumstances at the time he committed his crime cannot excuse his conduct, it does provide critical insight into his culpability.[6] Furthermore, understanding these factors explains how a dedicated and compassionate physician engaged in criminal conduct.

Abandoning the guidelines' truncated tale of Pham's criminal conduct in favor of his complete story exposes the factors that have caused his criminal acts. In its revelation of the unique failings that mitigate Pham's crime, as well as his punishment, considering his entire narrative provides the only path to justice. While Pham's past cannot excuse his actions, such a tortured history indicates that his sentence should not be based solely on his criminal conduct. If the Supreme Court precedent has any force, the Pham who committed crimes may be subject to condemnation, but the Pham as he appears today is worthy of this Court's mercy.

## Chapter 2
## Just Punishment

---

[6] The degree of a defendant's culpability in committing his crime including "his degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005).

> *All in all, punishment hardens and renders people more insensible;*
> *it concentrates; it increases the feeling of estrangement; it*
> *strengthens the power of resistance.*

Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887).

An unrecognized failure of the guidelines is its sole focus on imprisonment as a form of punishment. Because of this emphasis, the guidelines ignore that there are penalties stemming from felony conviction that are far worse than prison. *See*, *e.g.*, *Padilla v. Kentucky,* 559 U.S. 356, 360 (2010)("Deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes).

In Pham's case, his criminal conduct will likely lead to the loss of his medical license and his career as a doctor. It was a career that started as a young boy's promise to his mother and was achieved through struggle and sacrifice. And despite his criminal conduct, Pham's medical career was exemplary in his dedication to his patients regardless of their station in life. *See Letters of Support*, attached hereto as Exhibit 1.

The loss of Pham's medical vocation may be a collateral consequence of his felony conviction, but it is a severe consequence, nonetheless. Moreover, it is just one of the hundreds of collateral consequences he will face as a convicted felon. In imposing a just sentence, this Court should consider the significant punishment resulting from the collateral consequences of Mr. Munoz's felony conviction. A congressional report authored by the United States Government Accountability

Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), summary excerpt attached hereto as Exhibit 3. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id*.

Recognizing the effect of collateral consequences of a felony conviction, one district court has emphasized the need for federal judges to account for such an impact at sentencing *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016)(Block, J.)(varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). As *Nesbeth* establishes, the civil death that Mr. Munoz faces due to his conviction constitutes significant punishment. *See also* Wayne A. Logan, *Informal Collateral Consequences,* 88 Washington Law Review 1103 (2013)("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave"). *See also* Michelle Alexander, *The New Jim Crow* (2010).

Finally, Pham is haunted by remorse and shame due to the instant case. While his miserable state results from his own actions, a consideration of his condition is also important in terms of the punishment he has received for his crime. *See United States v. Prosperi*, 686 F.3d 32, 47-48 (1st Cir. 2012)(noting

that "sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed").

### Chapter 3
### Deterrence

> "No punishment has ever possessed enough power of deterrence to prevent the commission of crimes."

Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963).

The preceding discussion established that a lengthy prison sentence is not necessary to accomplish just sentencing. In turn, this section addresses the question of whether a long prison sentence will accomplish the § 3553 factor of deterrence. Such an analysis requires an analysis of both general and specific deterrence.

*1. General Deterrence*

The principle of general deterrence is the last refuge for the vindicative. Followed to its logical conclusion, the application of this § 3553 factor requires the imposition of a prison sentence in every case since it presumes that prison sentences deter crime. It is not surprising that federal prosecutors consistently argue the factor of general deterrence in support of guideline sentences. If you consistently assert that prison sentences are necessary to prevent crimes, then you gain strong support for guideline sentences that mandate imprisonment.

16

This false premise that incarceration is not only wrong but also is the primary contributing factor to mass incarceration. *See* Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015). To be sure, there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks:  Is There a "Collective Wisdom"*?, 59 Crime & Delinquency 1006, 1031-33 (2013) ("increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent").

Federal prosecutors' unwavering argument for general deterrence factor is hypocritical. Indeed, the Department of Justice (DOJ) has concluded that incarcerating defendants is not an effective means of deterrence.  *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit 4.  In fact, the DOJ finds that even increasing the severity of punishment does little to deter punishment. *See id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes"). Rather, arrests and prosecutions deter crime. *See id.*

2.    *Specific Deterrence*

Having established that prison sentences, regardless of length, have no

impact on general deterrence, this section establishes that the factor of specific deterrence also supports Pham's request for a variance.

      a.     *The relationship between incarceration and recidivism*

   As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), attached hereto as Exhibit 5. To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). Rather, there is strong evidence that prison actually contributes to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007). Thus, the most effective way to promote public safety is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections. Ex. at 5, 4.

      b.     *Pham's lower risk of recidivism*

The likelihood that the defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper,*

562 U.S. at 492. Pham is 55 years old and has no criminal history. Moreover, he is educated, has been employed throughout his life, and does not have a substance abuse problem. Because of these factors, Pham poses a lower risk of recidivism. *See* U.S. Sent. Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004).

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Pham, this Court should consider the statistically low risk of recidivism presented by him. *United States v. Urbina*, slip op., 2009 WL 565485, *2-3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties). The fact that Dr. Pham is in a Criminal History Category of I at the age of 55 further supports his request for a variance. *See, e.g.,* 28 U.S.C. § 994(j) (Congress stressed "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense.").

### Chapter 4
### Educational, Medical Care, or Other Correctional Treatment

> Judges carry the heavy burden of depriving individuals of their liberty. But the Bureau of Prisons shoulders the constitutional burden of protecting the remaining rights of the incarcerated while in custody.

*United States v. Bardell*, 634 F.Supp.3rd 1083, 1084 (M.D. Fla. 2022).

In assessing this factor, a critical issue is whether Pham, at age 55, will receive such effective treatment based on his age. The Office of the Inspector

19

General (OIG) consider individuals over the age of 50 to be aging inmates. *See* U.S. Dept. of Justice, OIG, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2016); *see also* J. Gerontel Nurs, *Caring for the Rapidly Aging Incarcerated Population: The Role of Policy,* Nat'l Instit. Of Health (April 25, 2025). The OIG has determined that:

> aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs. We further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates.

*See id.*

Against this backdrop, it is apparent that a sentence of imprisonment will constitute a harsher punishment based on Pham's age.

## Chapter 5
## The Guidelines

> *If you take a matrix to factor offense severity, overlay it with mandates born of popular outrage, and tailor it purportedly to address almost every eventuality, you get "justice" dictated in advance, marked by visceral condemnation, and based on the pretense of omniscience.*

*United States v. Williams*, 372 F.Supp.2d 1335, 1337-1338 (M.D. Fla. 2005).[7]

---

[7] Although *Williams* was reversed by the Eleventh Circuit in *United States v. Williams*, 456 F.3d 1353 (11th Cir. 2006), the Eleventh Circuit's decision was overruled by the United States Supreme Court. *See Kimbrough v. United States*, 552 U.S. 1353 (2007).

Because a minimum mandatory penalty does not apply, this Court may vary downward from the applicable guideline range. In this regard, the guidelines' recommendation is owed little deference.[8]  Promogulated to provide sentencing uniformity, the sentencing guidelines achieved its goal through the uniform imposition of sentences that were both irrational and unjustly harsh.

The history of the guidelines is a lamentable history of failure. For years, the crack guidelines sentenced offenders 100 times harsher than cocaine offenders despite the lack of an empirical basis for such a disparity. The drug guidelines were eventually amended to correct the problem.[9] But the cure, treating crack 28 grams the same as 500 grams of cocaine was equally absurd since it resulted from Congressional compromise rather than scientific evidence. *See, e.g.,* Safia Samee Ali, *AG Issues New Guidance on Ending Sentencing Disparities for Crack versus Powder Cocaine*, NBC News (Dec. 22, 2023), available at

---

[8] As recognized in *Gall*, district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49. *See also Rita v. United States*, 551 U.S. 338, 351 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). Or to borrow from Dorthy Parker's review of *Atlas Shrugged*, the guideline recommendation "is not to be tossed aside lightly. It should be thrown with great force."

[9]  The amendment to the crack guidelines was not a rare event. Indeed, the Sentencing Commission has amended the Guidelines Manual more than 800 times over a period of four decades. During the past forty years, Congress has rejected a proposed amendment only once. *See* Cong. Research Serv., Congressional Review of Proposed Amendments to the U.S. Sentencing Guidelines (June 6, 2023). The fact that the Guidelines have been changed over 800 times underscores their persistent failures. Of course, one could argue that the number of amendments demonstrates the guidelines are trying to get it right. Unfortunately, it underscores their inherent unreliability and persistent failures. *See, e,g,* Samuel Beckett, *Worstward Ho* (Grove Pr. 1984)("Try again, Fail Again, Fail Better"). When the guidelines fail or even fail better, the result is not spilt milk, but more human bondage.

https://www.nbcnews.com/news/us-news/ag-issues-new-guidance-ending-

sentencing-disparities-crack-powder-coca-rcna62162.

Unfortunately, the absurdity found in the crack guidelines is not the

exception. For instance, methamphetamine offenses are treated more severely

than fentanyl or heroin despite the latter substances' great health risks. *See*, *e.g*.,

DEA, National Drug Threat Assessment (March 2021). The guidelines treat one

gram of methamphetamine 20 times more harshly than one gram of heroin and

eight times more harshly than fentanyl. *See* USSG § 2D1.1(D).[10]

While a discussion of these guideline absurdities undermines confidence in

their recommended outcomes, such an analysis fails to address their most

fundamental problem. That is, the guidelines' rigid matrix is driven by a limited

narrative of criminal conduct and criminal history. Consequently, they disregard

the expansive narrative of a Defendant's life and disregard the § 3553(a) factors.

As recognized by Judge Tjoflat, in some cases the Guidelines may have little

persuasive force in light of the other § 3553(a) factors. *United States v. Glover*, 431

F.3d 744, 752-53 (11th Cir. 2005), *abrogation on other grounds*, *United States v.

Joseph,* 371 Fed.Appx. 70 (11th Cir. 2010)(unpublished).

Faced with the false promise of an illogical sentencing framework, the

---

[10] To further underscore the absurdity of the consistent absurdities of the sentencing guidelines, the methamphetamine guidelines were based on the crack guidelines. *See* Methamphetamine Trafficking Penalty Enhancement Act of 1998, Pub. L. No. 105-277, 122 Stat. 2681 (1998). Despite the Congressional mandate, which ignored empirical study, to treat methamphetamine identically to crack, the methamphetamine guidelines have not changed in response to the reduction in the crack guidelines.

further danger posed by the guidelines for Pham is their anchoring effect on determining the reasonableness of his sentence.[11] That is, Pham's punishment is judged by the extent that it departs from the starting point of a sentencing range that is arbitrary – without even a basis in empirical evidence or national experience. And therein lies the rub, in a quixotic effort to arrive at justice, we seek certainty from the starting point of an irrational guideline.

The inability of the guidelines to meet the requirements of § 3553 constitutes a grave failure in Pham's case. To be sure, a mechanical application of the guidelines in his case is necessarily inconsistent with a just sentencing process as contemplated by Supreme Court precedent and the § 3553(a) factors. Such a technical approach would only prove that injustice not always occurs through the impact of cataclysmic judicial decisions but often flows from the tide of quiet bureaucratic choices made without foresight or contemplation.[12]

## Chapter 6
## Restitution

---

[11] The anchoring effect is a person's tendency to rely heavily on the first piece of information they receive in decision-making. The effect often impacts decisions concerning numerical values such as pricing or the guidelines. *See* Andrea J. Caceres-Santamaria, *The Anchoring Effect,* Page One Economics, Federal Reserve Bank of St. Louis (April 2021).

[12] As one author noted,

> The greatest evil is not now done in those sordid 'dens of crime' that Dickens loved to paint. It is not done even in concentration camps and labor camps. In those we see its final result. But it is conceived and ordered (moved, seconded, carried, and minuted) in clean, carpeted, warmed, and well-lighted offices, by quiet men with white collars and cut fingernails and smooth-shaven cheeks who do not need to raise their voice.

C.S. Lewis, The Screwtape Letters at xxxvii (1961 ed.).

> *In imposing a sentence, the Court must consider "the need to provide restitution to any victims of the offense"*

18 U.S.C. § 3553(a)(7).

As previously noted, Pham has already paid $50,000 toward restitution. If he is incarcerated, Pham's ability to pay restitution will be severely impacted. Conversely, a non-prison sentence will allow him to fully pay restitution. *See* 18 U.S.C. §3553(a)(7). *See also United States v. Rangel*, 697 F.3d 795, 803-04 (9th Cir. 2012)("the district court's goal of obtaining restitution for the victims of Defendant's offense is better served by a non-incarcerated and employed defendant")(citation omitted).

## **CONCLUSION**

After all that, this Court is still tasked with determining a just sentence for Pham. As this memorandum demonstrates, the limited narrative of the guidelines disregards the broader story the lies behind the Indictment and PSR. And in doing such, avoids the requirements of legal precedent.

Considering the stories we tell about ourselves; Mr. Pham's life of suffering has forced the undersigned to reassess his own personal narrative – a naïve tale of determination and perseverance. At the age that Pham was being attacked by pirates, the undersigned was attending drawing classes at the Field Museum of Natural History in Chicago. And at the age when Pham was wearing hand-me-downs and struggling with English, the undersigned was attending private school. While the undersigned's life of privilege was set up so he could only succeed, the

tragedy of Pham's story is that it began in deprivation and will end in ruin. His sentence should not constitute another episode of destruction. Justice, if not basic human decency, demands more.

Respectfully submitted,

*/s/ Fritz Scheller*
Fritz Scheller

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all parties this 12th day of December 2025.

/s/ Fritz Scheller
Fritz Scheller
Florida Bar Number 183113
Fritz Scheller, P.L.
200 E. Robinson St., Ste. 1150
Orlando, Florida 32801
Telephone 407-792-1285
Facsimile 407-649-1657
Email: fscheller@flusalaw.com

25